# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

RHONDA K. BLOOM,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C09-4083-PAZ

**MEMORANDUM OPINION AND
ORDER**

———————————

    This matter is before the court for judicial review of the defendant's decision denying the plaintiff's applications for disability insurance ("DI") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*

    On April 23, 2007, the plaintiff Rhonda K. Bloom filed applications for DI and SSI benefits alleging she had been disabled since October 15, 2003. Her applications were denied initially and on reconsideration. A hearing was held before an Administrative Law Judge ("ALJ") on February 25, 2009. On May 28, 2009, the ALJ issued his decision, ruling that Bloom was not disabled and therefore was not entitled to benefits. On September 3, 2009, the Appeals Council denied Bloom's request for review, making the ALJ's decision the final decision of the Commissioner.

    Bloom filed a timely Complaint in this court seeking judicial review of the ALJ's ruling. She claims the ALJ's finding that she is not disabled is not supported by substantial evidence in the record. She asks the court to reverse the ALJ's decision and order the award of benefits.

On November 19, 2009, with the parties' consent, Judge Mark W. Bennett transferred the case to the undersigned for final disposition and entry of judgment. The parties have briefed the issues, and the matter is now fully submitted and ready for review.

The court must decide whether the ALJ applied the correct legal standards, and whether his factual findings are supported by substantial evidence based on a review of the record as a whole. 42 U.S.C. § 405(g); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citations omitted). In this deferential review, the court will consider the record in its entirety to determine whether a reasonable mind would find the evidence adequate to support the Commissioner's conclusion. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citations omitted); *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006).


### *Testimony at ALJ Hearing*

Bloom testified that she is 53 years old, 5'3" inches tall, and weighs 128 pounds. She is a high school graduate. At the time of the hearing, she was taking Cymbalta for depression; Advair, ProAir, Allegra, Singulair, and Nasonex for asthma; and vitamins.

Bloom last worked in 2007, as a cashier at Quiznos, where she worked about three hours a day, four or five days a week. She quit because she had trouble learning how to operate the cash register, and because of problems she had standing. She testified she "just couldn't do it anymore." R. 48. Before that, she worked at a Dollar Tree store putting stock away and as a cashier. She worked there for about three years, thirty-two to thirty-four hours a week. She quit because of the heavy lifting, and because it was hard for her to stand and to move her shoulders and arms. Before that, she worked as a cashier and carry-out person at a grocery store. She quit because she "just couldn't" do the job because "everything was real heavy and [she] was hurting so bad." R. 36.

Bloom testified that she can only stand for ten to fifteen minutes before she has pain in her legs, back, and neck. If she holds her arms out in front of her, she has pain in her

shoulders and collar, and her ribs will pop out of place. She is not able to sit at a desk or look down at a keyboard for any extended period of time because it hurts to tip her head forward. She can type, but it hurts to sit very long, and her hands and fingers will hurt.

She has lung problems, which she thinks affects her ability to work, although not as much as her back problems. The lung problems are controlled "pretty good" by her medications, and no doctor has ever limited her activities because of lung problems. She smokes half a pack of cigarettes a day.

Bloom testified she is always in a lot of pain, particularly in her back. She believes she is disabled by this pain, although no medical doctor has ever limited her activities based on pain. She takes over-the-counter medicine for the pain. No doctor has ever told her she needed to see a back specialist, and she has never asked to see one. She has never had medical tests on her back, and has never tried to get help with her medical care based on lack of income. She sees a chiropractor regularly for her back pain, and is charged $20 a visit.

She believes she suffers from depression, but she had not seen a psychologist or psychiatrist for more than twenty years. A nurse practitioner prescribes Cymbalta for her depression, and it seems to control her symptoms. Because she cannot afford the medication, she gets it through a special arrangement with the manufacturer. She has never been referred for mental health treatment by a doctor.

Bloom testified her activities of daily living are limited. She is unable to walk around the block. She can drive a car, but does not drive very often. When she goes grocery shopping, someone will take her to the store and she will ride around in a motorized cart. She does not clean the house or do any cooking. She does not do very much in the kitchen. She is unable to lift a pan of food from the stove to the sink. She cannot read because of a car accident when she was eighteen years old in which she hit her head and suffered some type of amnesia. She uses a cane, which her husband bought for

her about three years before the ALJ hearing because of problems she was having "with [her] sciatic nerve" and because she "couldn't hold [her]self up." R. 54. The cane was not prescribed by a doctor.

The plaintiff's twenty-one-year-old son testified that it is hard for his mother to drive to the store because the steering on her car is "really tight." R. 60. At the store, it is difficult for her to lift certain items into her cart. She also has problems with her memory. She will have trouble finishing sentences, and will "space out." She does not do any of the household chores because her husband does not believe she can do them anymore.

### *Medical Records*

On May 20, 2002, Bloom presented at the Spirit Lake Medical Center ("Spirit Lake") complaining of shortness of breath. She continued going to Spirit Lake for her primary medical care on a regular basis until 2006. The notes of her first visit reflect that she had a significant smoking history, and she had been taking antibiotics for several months to treat breathing difficulties. She was diagnosed with "moderate airway obstruction" and was counseled "extensively" on the need to quit smoking cigarettes. R. 246. On October 14, 2002, she returned to Spirit Lake complaining of depression, problems concentrating, and feeling "drained all of the time." She was given a prescription for Effexor. On June 24, 2003, she complained of back pain, coughing, and breathing problems. She was given antibiotics and again was advised to quit smoking. On March 8, 2004, she complained of coughing and chest congestion, and was put on antibiotics and Advair. On March 16, 2004, she reported she was not much better, and was given some different antibiotics. On March 31, 2004, she still was complaining of coughing and congestion, and was diagnosed as suffering from lead exposure. On October 7, 2004, she complained of a sore throat, coughing, and allergies. On October

4

13, 2004, she reported she was not doing any better. She returned to Spirit Lake on January 28, 2005, still complaining of coughing and congestion. On February 21, 2005, she complained of chest "tightness and wheezing and excessive fatigue, which had been going on 'for a long time.'" R. 243. On April 22, 2005, she complained of anxiety and nervousness because of her husband's drinking. She stated she did not feel good, but could give no specific reason. On May 1, 2005, her anxiety and depressive symptoms were "greatly improved and normalized on Cymbalta." She was "optimistic about the future." R. 235. Except for a few brief notations, it appears that throughout the four years Bloom was treated at Spirit Lake, she did not complain of depression or of pain in her back, shoulders, or arms.

In May 2006, Bloom switched her primary care to Sioux Rapids Family Care ("Sioux Rapids"). On May 31, 2006, she was seen at Sioux Rapids with "possible depressive symptoms." R. 276. She reported she was suffering from a sleep disturbance, irritability, abnormal bloating, headaches, and depression. On October 25, 2006, she again was seen at Sioux Rapids, complaining of dizzy spells, lightheadedness, and ringing in her ears, but no respiratory symptoms or pain. While on Cymbalta, her pain, depression, and sleep problems almost completely resolved, but she recently had stopped taking Cymbalta because her prescription had run out. She was given samples of Cymbalta to last for one month. X-rays taken on July 17, 2006, showed "osteopenia with levorotoscoliosis and mild osteoarthritis of the lower spine." R. 292. Otherwise, her spine was normal.

In a letter to the Social Security Administration dated May 15, 2007, Dr. Elizabeth C. Kressin, a chiropractor, gave her opinions about Bloom's history, diagnosis, and prognosis. She stated that Bloom had been a patient at her office since September 1998. Beginning in 1998, Bloom developed osteoarthritis, especially in her cervical spine, which radiated to her shoulder area, especially her left shoulder. Dr. Kressin diagnosed Bloom

as suffering from "osteoarthritis and osteoporosis," and concluded that her prognosis was fair. She stated the following:

> The patient's remaining work related capacity in my opinion is that she can lift and carry five pounds three to five times per hour. She can stand in one place for no more than one hour without then being able to walk or sit. She can sit no longer than one hour without getting up and moving around due to the osteoarthritis. I would not recommend stooping, climbing, kneeling or crawling due to the osteoarthritis. She has no limitations with seeing, hearing or speaking. Traveling over an hour will aggravate the osteoarthritis. Her work environment should be free of fumes and the temperature should be normal room temperature throughout any work shift as the variations in temperature aggravate the osteoarthritis.

R. 279-80.

On June 26, 2007, Dr. Jeffrey J. Goerss, a doctor at Spirit Lake, performed a consultative physical examination for the Social Security Administration. Dr. Goerss took a history from Bloom during which she told the doctor that she "has always had a little bit of history of back pain during her adult life," and she had been seeing chiropractors for this problem since 1996. She stated that four or five years earlier, a Spirit Lake doctor had told her that she had severe degeneration in her back. She stated the pain had gotten progressively worse, to the point that she cannot stand, walk, or sit for any period of time. She reported that her memory is not very good because of some sort of amnesia. She also told Dr. Goerss that she is deaf in one ear, and has a history of asthma.

On physical examination, Bloom appeared normal, although her slow movements were consistent with back pain. She had somewhat limited ranges of motion in her lumbar spine, hip, and knee, but otherwise, her range of motion and her muscle strength were good. She had normal ranges of motion in her shoulder, elbow, and wrist. Dr. Goerss concluded that she "seems to have no major nerve impingement but just seems to be in

chronic pain that would limit her occupations." R. 289. She had no wheezing, rales, or rhonchi.

On July 16, 2007, a "six view lumbar spine series" of x-rays was taken at the Spencer hospital. The reviewing radiologist saw no evidence of acute fractures, dislocations, or lytic or blastic defects. The rest of the radiologist's findings were unremarkable. The radiologist's impression was "osteopenia with levorotoscoliosis and mild osteoarthritic lumbar spine." R. 292.

On August 3, 2007, Dr. C. David Smith completed a Physical Residual Functional Capacity Assessment of Bloom. He concluded that Bloom could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for about six hours in an eight-hour workday; sit, with normal breaks, for about six hours in an eight-hour workday; and do unlimited pushing and pulling. Dr. Smith stated that Bloom was limited in some of her activities by osteoarthritis and osteopenia, but those limitations could be addressed without interruption of work if she were able to change positions at her work station or in the course of normal breaks. She could only occasionally climb, balance, stoop, kneel, crouch, and crawl. She also should avoid exposure to fumes, odors, dust, gases, and poor ventilation. Dr. Smith stated, "The lack of evidence of ongoing medical care directed at osteoarthritis of the spine and osteopenia severely erodes the credibility of [Bloom's] allegations." R. 316.

On October 15, 2007, Dr. John May performed a "case analysis" for Disability Determination Services (DDS), in which he reconsidered Dr. Smith's assessment. Dr. May concurred in Dr. Smith's assessment, stating the following:

> On the reconsideration application the claimant states her pain continues to be severe. She attempted to return to work but was unable to do so due to her pain. She has been seen by her chiropractor only since the initial decision. These records were requested but have not been received to date. Updated ADLs were obtained and these limitations are not significantly

> different than those submitted on the initial level. The entire
> file has been reviewed and the initial assessment dated 8/3/07
> is affirmed as written.

R. 320.

In 2008, Bloom continued treatment with Sioux Rapids, primarily for prescription refills of asthma and depression medication. On August 28, 2008, she was given a "complete female physical" at Sioux Valley by nurse practitioner Sue Terrell. Bloom was noted to have a past medical history of depression, tobacco use, osteoporosis, arthritis, and surgical menopause. Under "psychiatric," Terrell noted Bloom "[c]ontinues to have some depressive symptoms and a lot of pain from her arthritis. She did have some improvement noted initially with the Cymbalta at her current dose, however, that seems to have gotten worse again." All other findings were normal. During the physical, Bloom demonstrated normal strength, and reported no back pain or breathing problems. Terrell increased the dosage of Cymbalta. She also discussed with Bloom diet and regular exercise. R. 322-23. On October 9, 2008, Bloom reported that the increased dose of Cymbalta was helping.

On February 9, 2009, at the request of Bloom's attorney, Stephanie McClellan, an occupational therapist, completed a functional capacity evaluation. McClellan reached the following conclusions:

> The patient feels depressed, has poor sleep habits and . . .
> limits her activities. This all may decrease a person's
> tolerance for pain. Feel she may benefit from treatment at a
> Pain Clinic or perhaps seeing a specialist to help determine if
> additional treatments may help to decrease her pain level.

> The patient seems to be very pain focused. As she indicated
> throughout the FCE, most, if not all aspects of her life are
> controlled by her symptoms. Her future goals are undefined.
> She feels she cannot work at any type of job due to pain. Feel
> that she may benefit from a structured process, such as
> counseling to help define her future goals.

In my opinion, the patient has an abnormal psychological component to her pain and displays behaviors consistent with symptom magnification. This was evident with non-specific pain locations, i.e., the "entire back", and "entire shoulder region." Also, Patient scored a 41 on The Revised Oswestry Low Back Disability Questionnaire indicating that she may be exaggerating her symptoms. On the Waddell's Inappropriate Symptoms Questionnaire patient scored a 3 indicating symptom magnification. During the work activities and material handling portion of the FCE, she rated her pain levels at 9.5 to 10.0. It appeared she was in pain as she was grimacing, however, no other pain behaviors were noted and minimal high effort behaviors were noted throughout the FCE.

If the patient were to seek employment in the future, she demonstrates the physical capabilities to complete jobs requiring the **Sedentary Physical Demand Level**. The following are Work Activities restrictions:

Overhead Reach: Never

Reaching Forward: Occasional

Bending: Infrequent

Squatting: Never

Kneeling: Infrequent

Stair Climbing: Infrequent

The following are Material Handling restrictions:

Knee Life: Occasional

Waist Pivot Lift: Occasional

Floor Life: Never

Overhead Lift: Never

Shoulder Lift: Occasional

Two-Hand Carry: Occasional

Left Hand Carry: Occasional

> Right Hand Carry: Occasional

The follow[ing] are Work Posture restrictions:

> Sitting: Constant
>
> Neck Flexion: Infrequent
>
> Static Standing: Infrequent
>
> Dynamic Standing: Infrequent
>
> Walking: Infrequent

R. 369-70. The tests administered by McClellan indicated that Bloom was exaggerating her symptoms and over-limiting her participation in activities. They also demonstrated that Bloom had intact short- and long-term memory.

On June 13, 2007, Don E. Johnson, a licensed psychologist, performed a psychological examination and evaluation of Bloom for DDS. Bloom told Dr. Johnson that her primary problems are from osteoporosis and arthritis, principally in her back. She also reported that she had become increasingly forgetful over the preceding year, and had been diagnosed with depression. She stated she was responding "very well" to Cymbalta, which allowed her to function almost normally. R. 282.

Dr. Johnson concluded Bloom did not have a thought disorder, and was relatively free of depressive symptoms as long as she continued to take her medication. He felt that issues concerning her memory needed to be explored. He set out the following mental limitations on work-related activities:

> Remembering and understanding instructions, procedures, and locations: Rhonda has experienced memory problems at work that in many situations would have jeopardized her job. This seems to be a significant problem.
>
> Carrying out instructions by maintaining attention, concentration and pace: Rhonda has experienced memory problems at work that in many situations would have jeopardized her job. This seems to be a significant problem.

> Interacting appropriately with supervisors, co-workers, and the public: Rhonda is a very pleasant person who enjoys other people. This should not be a problem for her.
>
> Using good judgment and responding appropriately to changes in the work place: Rhonda has experienced memory problems at work that in many situations would have jeopardized her job. This seems to be a significant problem.

R. 284. He assigned Bloom a GAF of 54. *Id*.

On August 2, 2007, Dr. Herbert Notch, a psychologist, completed a Mental Residual Functional Capacity Assessment form and a Psychiatric Review Technique form regarding Bloom. On the Mental Residual Functional Capacity form, he stated that Bloom was moderately limited in her ability to remember locations and work-like procedures and to understand detailed instructions. Otherwise, she had no significant impairments in her understanding or memory. She was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. Otherwise, she had no significant impairments in concentration or persistence. She was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and to get along with coworkers and peers without distracting them or exhibiting behavioral extremes. Otherwise, she had no significant impairments relating to social interaction. She was moderately limited in her ability to respond appropriately to changes in the work setting and to set realistic goals and make plans independently of others. Otherwise, she had no significant impairments relating to adaptation.

On the Psychiatric Review Technique form, Dr. Notch stated Bloom suffered from depression, with a GAF of 45. Dr. Notch concluded as follows:

Claimant['s activities of daily living] are intact in that clamant can do simple cooking, clean, drive, handle funds, and socialize. There was a provisional concern secondary to [a] past [motor vehicle accident], but that did not reach diagnostic level. Claimant had depressive disorder med controlled, and now more recent memory concerns re recent [Wechsler Memory Scale] III Testing. General memory is seen to be extremely low by index. Medical and nonmedical evidence since [the Consultative Examination] is credible and consistent with low average to borderline functioning. Claimant can do simple routine worklike activities.

R. 309.

On October 3, 2007, John Tedesco, a psychologist, performed a "case analysis" for DDS, reconsidering the assessment of Dr. Notch. Dr. Tedesco agreed completely with Dr. Notch's assessment, stating the following:

On the reconsideration application the claimant does not indicate any changes in her condition mentally. There is no additional objective evidence to be obtained. I have reviewed the entire file and the assessment dated 8/2/07 is affirmed as written. Her amnestic disorder has been present presumably for more than 30 years. The claimant has been able to work at SGA levels since her accident.

R. 319.


### *Vocational Expert's Testimony*

A vocational expert ("VE") testified at the ALJ hearing. The ALJ asked the VE the following hypothetical question:

Assume with me that you're dealing with an individual on both sides of 50, currently above age 50, not yet 55, high school educated, work history as you described, has medically determinable impairments that first of all assume cause the same work related limitations described in the testimony this morning. What if anything is the vocational effect of that testimony given full weight and credibility?

12

R. 65. The VE responded that the hypothetical individual would not be able to return to her past work or any other type of work on a regular basis.

The ALJ then asked the VE a second hypothetical question:

> Hypothetical two is intended to ask you about the State Agency's assessment. Same vocational profile of age, education, and work experience. This is going to have a physical component and a mental health component. Please assume a person who could occasionally lift or carry 20 pounds, frequently 10 pounds, can stand or walk about six of eight hours.[1] Can sit for about six of eight hours but they have checked must periodically alternate sitting or standing to relieve pain or discomfort. And at the bottom of the page, the examiner stated changes in position can be performed in the course of normal breaks or at the work station without interruption of work. Push/pull is unlimited. Postural activities are all occasional. No manipulative, visual, communicative limitations. Environmentally, they would avoid concentrated exposures to vibrations and to respiratory irritants. . . . Let's plug in additional limitations taken from [the Mental Residual Functional Capacity Assessment form dated August 2, 2007, completed by Dr. Notch, R. 293-96] in the ability to make personal, social and occupational adjustments in a job setting. Page three is the mental RFC, but it refers you to another exhibit, [the] psychiatric review technique form [prepared by Dr. Notch also on August 2, 2007, R. 297-310], [a]nd the conclusions of the examiner [on R. 309]. Assume a person who can perform simple, routine work like activities. Plugging together the mental and the physical limitations, does this appear to be consistent or inconsistent with past work?

R. 66. The VE responded that the hypothetical individual would be able to perform some of Bloom's past jobs, and also would be able to perform a number of other jobs, including deliverer outside; tanning salon attendant; and assembler, small products. R. 69.

---

[1]The physical limitations are taken from the Physical Residual Functional Capacity Assessment form completed by Dr. Smith on August 3, 2007. R. 311-18.

The ALJ then asked a third hypothetical question:

> Hypothetical three is a functional capacities evaluation [completed by Stephanie McClellan on February 9, 2009, R. 327-46]. . . . Does it appear to be consistent or inconsistent with her past work?

R. 70. The VE responded that it was inconsistent with her past work, as well as any other regular work.

## *The ALJ's Decision*

In his decision, the ALJ found that Bloom has not engaged in substantial gainful activity since October 15, 2003, her alleged disability onset date. The ALJ determined that Bloom has the following severe impairments: osteoarthritis of the lumbar and thoracic spine, degenerative joint disease, depressive disorder, osteoporosis, and asthma, but none of these impairments, singly or in combination, meet the requirements of the Listings.

The ALJ stated he had considered the entire record carefully, and he had concluded that Bloom has the residual functional capacity to perform a range of light work, as follows.

> The claimant is able to lift and/or carry twenty pounds occasionally and ten pounds frequently; can sit (with normal breaks) for a total of six hours in a normal eight-hour work day; and, can stand and/or walk (with normal breaks) for a total of six hours in a normal eight-hour work day. The claimant must periodically alternate sitting and standing to relieve pain and discomfort; these changes of position can be performed in the course of normal breaks or at the work station without interruption of work. The claimant may perform postural activities (climbing, balancing, stooping, kneeling, crouching, and crawling) on an occasional basis. She has no manipulative, visual, or communicative limitations. The claimant must avoid concentrated exposure to vibrations and pulmonary irritants (fumes, odors, gases, poor ventilation,

> etc.)   The claimant is limited to work involving simple,
> routine, worklike activities.

R. 14.  The ALJ stated that in making these findings, he had considered all of Bloom's symptoms to the extent they reasonably could be accepted as consistent with the objective medical evidence and other evidence.

The ALJ found that Bloom's medically-determinable impairments reasonably could be expected to cause her alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they were inconsistent with the ALJ's RFC findings.  He found, "Although the record shows that the claimant has some health-related issues, it contains no credible evidence showing that the claimant's impairment is of a type or nature such as would preclude all employment by the claimant and thus require a finding of 'disabled' during any portion of the period under review."  *Id.*

The ALJ gave great weight to the opinions of Dr. Smith, Dr. May, Dr. Notch, and Dr. Tedesco.  He also gave great weight to the treatment records from Spirit Lake and Sioux Rapids and the opinions of her treating doctors, as well as the opinions of Dr. Johnson and Dr. Goerss.  He gave little weight to the opinions of Dr. Kressin, Bloom's chiropractor, or to those of occupational therapist McClellan.  He noted that under Social Security regulations, a chiropractor is not considered an acceptable medical source for diagnoses of impairments, and he found that Dr. Kressin's treatment records do not support the severe limitations she recommends.  *Id.*  He also found the severe limitations recommended by McClellan not to be supported by the great weight of credible medical evidence of record.  *Id.*

The ALJ found as follows:

> In sum, the above residual functional capacity assess-
> ment is supported by credible medical evidence of record.  The
> evidence in this case shows that during the time period in issue
> the claimant generally is able to care for herself as far as day-

to-day needs were concerned. She acknowledged that, aside from needing occasional help in exiting the bathtub and fastening her shoes and clothing, she generally was able to attend to her own personal needs and grooming (including dressing, bathing, preparing meals, feed herself, toileting). She is able to drive an automobile, to do some shopping and to go out alone. The claimant is able to do some household chores like cleaning, some meal preparation and cooking, laundry, and dishwashing. Although she stated that she has trouble in handling her own financial affairs, several medical examinations indicate she is capable of handling her own funds. She stated that she loved to go camping with her husband. Her medical treatment records indicate that she attends church. She enjoys the company of friends and family, with whom she interacts continuously, visiting and going out for coffee. She goes to the Moose Lodge, and once a month she goes to play bingo. In addition, the claimant has held several part-time jobs during the relevant time period, working at a sandwich shop, as a kitchen manger, and other jobs. The course of medical treatment for both her mental and physical impairments properly may be classified as intermittent at times and conservative in nature. The undersigned finds that the claimant's medical treatment, activity level, and level of functioning are incompatible with a finding of total disability.

The above RFC accommodates the claimant's reduced physical abilities by precluding her exposure to jobs requiring the lifting/carrying of items of excessive weight, and by precluding jobs that require performance of postural activities on more than occasional basis. The claimant's reduced ability to sit or stand for long periods of time is accommodated by the limitation to jobs that allow for changes in position in the course of normal breaks or at the work station without interruption of work. The claimant's asthma is accommodated by limiting her exposure to environmental/pulmonary irritants. This RFC accommodates her mental impairment and the resulting negative impact on her memory and concentration, by limiting her to jobs which require the performance of only simple routine, worklike activities.

The record contains no evidence that is incompatible with the performance of a range of work at the light exertional level. The medical records and the testimony of the claimant describing her limitations demonstrate that such limitations will not interfere with her ability to function independently, appropriately, effectively, and on a sustained basis. The undersigned has considered the claimant's allegations and has found them inconsistent with the objective medical findings in the record. The claimant's testimony is not well supported by the objective medical evidence in the record and therefore not entitled to controlling weight. Consideration has also been given to the reports of the state agency medical consultants as well as to other treating, examining, and non-examining sources.

R. 21-22.

Based on these findings, the ALJ ruled that Bloom was able to perform the requirements of unskilled, light occupations such as deliverer, outside; tanning salon attendant; and assembler, small products. The ALJ found that Bloom has not been under a disability, as defined by the Social Security Act, from October 15, 2003, to the date of the ALJ's decision.

### *Discussion*

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043

(8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant

retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *See Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir.

2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)) *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo.*" *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to

draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See*

*Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)    the claimant's daily activities;
> 2)    the duration, frequency and intensity of the pain;
> 3)    precipitating and aggravating factors;
> 4)    dosage, effectiveness and side effects of medication;
> 5)    functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Bloom challenges the ALJ's reliance on the opinions of Dr. Smith, pointing out two minor errors in Dr. Smith's report. Doc. No. 11, at 5. Dr. Smith stated that the alleged onset date of Bloom's disability was November 29, 2004, while Bloom alleges she was disabled beginning October 15, 2003. Dr. Smith referred to tests performed July 17, 2007, while it appears the tests were performed a day earlier, on July 16, 2007. These discrepancies were insignificant, and do not detract from the weight of Dr. Smith's opinions.

Bloom also takes issue with ALJ's finding that the opinions of Dr. Kressin, Bloom's chiropractor, are entitled to little weight. The ALJ was justified in not relying on these opinions. "Chiropractors are not acceptable medical sources." *Kelley v. Massanari*, 18 Fed. Appx. 453, 454 (8th Cir. 2001) (citing 20 C.F.R. § 404.1513(a) (2001)).

Bloom also challenges the ALJ's reliance on the opinions of Dr. Goerss because when he examined Bloom on June 26, 2007, he did not have available the x-rays taken on July 16, 2007. This argument is not persuasive. There is nothing in the record to suggest that the x-rays would have changed Dr. Goerss's opinions.

Bloom argues the testimony of the VE supports a finding of disability, pointing out that the VE opined Bloom would be disabled under the facts assumed for the first and third hypothetical questions. The problem with this argument is that the ALJ included in the second hypothetical all of the impairments he found to apply to Bloom, while in the first and third hypotheticals he included alleged impairments he found not to be credible. The Eighth Circuit has held an ALJ's hypothetical question must fully describe the claimant's abilities and impairments as evidenced in the record. *See Chamberlain v. Shalala*, 47 F.3d 1489, 1495 (8th Cir. 1995) (citing *Shelltrack v. Sullivan*, 938 F.2d 894, 898 (8th Cir. 1991)). However, a hypothetical question is "sufficient if it sets forth the impairments which are accepted as true by the ALJ." *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *House v. Shalala*, 34 F.3d 691, 694 (8th Cir. 1994). Only the impairments substantially supported by the record as a whole must be included in the ALJ's hypothetical. *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) (citing *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993)). Thus, in the first hypothetical question, the ALJ gave full weight to Bloom's claimed limitations, but because the ALJ found Bloom's testimony concerning her limitations not to be credible,[2] the ALJ was entitled to ignore the VE's response to the question. The third hypothetical question was based on the opinions of occupational therapist McClellan, opinions which the ALJ found not to be supported by the credible medical evidence. Again, the ALJ was justified in giving little weight to those opinions.

---

[2]The ALJ made this finding after conducting an appropriate analysis under *Polaski*.

The ALJ's finding that Bloom is not disabled is supported by substantial evidence in the record. Bloom claims that her most serious impairments are caused by back pain, but throughout years of regular treatment at Spirit Lake, and later at Sioux Rapids, she almost makes no mention of disabling back pain. No doctor has ever limited her activities because of back pain. She also claims she is disabled by depression, but she has not sought help from a mental health professional for this problem, and the record establishes that the problem is controlled by medication. Her breathing problems seem to arise mostly from smoking, and in any event, do not appear to restrict significantly her ability to work. Her alleged memory problems are not documented in the record, and in any event, do not restrict her ability to perform the jobs listed by the VE in response to the second hypothetical question. It was Bloom's burden to prove disability at step five of the sequential evaluation process, *see Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir .2004)), and she has failed to sustain that burden.

Accordingly, the Commissioner's decision is hereby **affirmed**.

**IT IS SO ORDERED.**

**DATED** this 2nd day of June, 2010.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT